**EL PASO ELECTRIC RY. CO. v. BUTTREY.\***
(No. 1564.)

(Court of Civil Appeals of Texas. El Paso. March 13, 1924. Rehearing Denied April 3, 1924.)

1. **Appeal and error** &#9092;&#10233;1053(1)—**Error in reception of evidence cured by withdrawing it from jury.**

In action for death of an employee, who came in contact with high voltage electric wires while sweeping defendant's substation, evidence of an electrical engineer who examined defendant's power plant that in his opinion the installation of the substation was not safe, *held* not prejudicial, in view of subsequent withdrawal of such evidence.

2. **Pleading** &#9092;&#10233;245(3)—**Permitting trial amendment held not error.**

In an action for death of an employee who came in contact with high voltage electric wires while sweeping defendant's substation, where plaintiff had not assigned as negligence the failure to elevate transformers, thus raising the wires to a position not easily touched, permit-

&#9092;&#10233;For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

\*Writ of error dismissed for want of jurisdiction May 28, 1924.

260 S.W.—57

ting, over defendant's objection, trial amendment to the petition to meet evidence tending to show that the transformers should have been elevated, did not show reversible error.

**3. Pleading ⬯236(1)—Allowance of amendment discretionary with trial court.**

Allowance of an amendment is largely discretionary with the trial court, and the party attacking exercise of that discretion must show its abuse to his injury.

**4. Death ⬯91—Evidence of life insurance immaterial.**

Where a mother's action for death of a son was for actual pecuniary damages, the measure of which was the probable amount that he would have contributed to her support had he lived, evidence that he carried government insurance payable to her was irrelevant and immaterial, and was inadmissible to show that her statement that she was destitute was not wholly true, being an immaterial matter.

**5. Witnesses ⬯405(1)—Not contradicted or impeached about immaterial matter.**

A witness making a statement about an immaterial matter cannot be contradicted or impeached by showing that his testimony is false.

**6. Death. ⬯91—Damages not reduced by life insurance.**

Since, under the Statutory Damage Act, the damage is fixed by the statute, in an action by a mother for death of a son her damage could not be set off by showing that the son had provided for her through insurance, and evidence thereof was inadmissible to show receipt of money from insurance or existence of an insurance policy.

**7. Master and servant ⬯286(20)—Sufficiency of passageway near electric wires held for jury.**

In a mother's action for death of a son, who came in contact with high voltage electric wires while sweeping defendant's substation, evidence *held* sufficient to justify submission of the issue whether insufficient width of passageways was the negligent and proximate cause of the death.

**8. Master and servant ⬯289(21)—Contributory negligence in coming in contact with electric wires held for jury.**

In action for death of an employee sweeping defendant's substation, when he came in contact with a high voltage electric wire, where the risk from danger of contact with the wire under the circumstances did not disclose deceased's contributory negligence, so as to invoke the rule of comparative negligence under Vernon's Sayles' Ann. Civ. St. 1914, art. 6645, as amended by Acts 37th Leg. (1921) c. 100, *held* that it was for the jury to say what an ordinarily prudent man under the circumstances would have done.

**9. Master and servant ⬯204(1)—Charge on assumed risk held properly refused under statute.**

In action for death of an employee who, while sweeping defendant's substation, came in contact with high voltage electric wires, *held*, there was no error in refusing charge on assumed risk, in view of Vernon's Sayles Ann. Civ. St. 1914, art. 6645, as amended by Acts 37th Leg. (1921) c. 100, providing that while employees assume ordinary risks, they do not assume risks resulting from employer's negligence, though known to them.

**10. Death ⬯99(5)—$10,000 for son's death not excessive.**

$10,000 damages to a mother who was 54 years old, for death of an unmarried son 24 years of age, earning $125 per month, *held* not excessive.

Appeal from District Court, El Paso County; P. R. Price, Judge.

Action by Helen G. Buttrey against the El Paso Electric Railway Company. Judgment for plaintiff, and defendant appeals. Affirmed.

Baker, Botts, Parker & Garwood, of Houston, and Goggin, Hunter & Brown, of El Paso, for appellant.

Gowan Jones, of El Paso, for appellee.

WALTHALL, J. Appellee, Helen G. Buttrey, a feme sole, brought this suit against the appellant, El Paso Electric Railway Company, to recover damages alleged to have been sustained by her on account of the death of her son, Lester G. Buttrey, who, at the time of his death was unmarried, 24 years of age, and an employee of the defendant company, engaged in sweeping out defendant's substation at the intersection of Grama and Morency streets in the city of El Paso. Plaintiff alleged that while so engaged at said substation, and without negligence on his part, her said son came in contact with and received a shock from one of defendant's electric wires carrying a high voltage, which caused his death, that the said son at the time of his death lived with her, contributed to her sole support, and would have continued to do so as long as he lived, and that his death left her with comparatively no means of support.

Plaintiff alleged that her son's death was caused by the negligence of the defendant company in not furnishing her said son a reasonably safe place in which to perform his service in the following respects, viz.: (1) The passageway he was sweeping was too narrow and too near the high voltage wires: (2) the high voltage wires were improperly insulated; (3) defendant failed to cut off the electric current, when it should have done so, at the time her son was sweeping out the substation; (4) the failure to have the high voltage wire, which caused her son's death, elevated instead of resting on the ground.

The defendant answered by a general denial, assumed risk, and contributory negligence.

The case was tried with a jury and submitted upon special issues; the court sub-

---

mitting all four of the above-assigned acts of negligence.

On the several issues submitted the jury found substantially as follows: (1) That Lester G. Buttrey, while in the course of his employment for defendant, came to his death by coming in contact with an electric wire in the substation of defendant at the place alleged. (2) That the substation was other than a reasonably safe place for him to perform the duties of his employment on account of the width of the passageway in or near which he was injured. (3) That defendant failed to use ordinary care in respect to the width of the passageway in or near which Lester was injured. (4) The failure to use ordinary care as to the width of said passageway was the proximate cause of Lester's death. (5) That the wire with which Lester came in contact, thereby causing his death, was improperly insulated at that time. (6) That defendant was negligent in not having said wire properly insulated at that time. (7) The negligence in not having said wire properly insulated was a proximate cause of Lester's death. (8) Plaintiff suffered pecuniary damage by the death of Lester. (9) Ten thousand dollars, if paid now, would reasonably compensate plaintiff for the pecuniary damage resulting to plaintiff by the death of her son.

In answer to supplemental questions submitted, the jury found: (1) Lester did not come to his death by reason of a risk ordinarily incident to his employment. (2) (The jury did not answer the question as to comparative negligence.) (3) Defendant was not guilty of negligence in failing to cut off the electric current at the substation at the time Lester was sweeping out that station. (4) (The issue of proximate cause on issue 3 not answered.) (5) Defendant was guilty of negligence in having the transformers resting on the ground and not elevated. (6) The negligence as found under the above issue 5 was a proximate cause of the death of Lester.

On defendant's special issues submitted the jury found: (1) Lester was not negligent in coming into close proximity, or into contact, with the primary lead wire of the southermost transformer. (2) (As to the negligence of Lester, inquired about as above as being the sole cause of his death, the jury did not answer.) (3) Lester's arm came into contact with the primary leads leading from the wires overhead to the most southerly transformer in the said substation. (4) Lester was not guilty of negligence in causing or permitting his arm to come into contact with said wire.

On the above findings of the jury the court rendered judgment for plaintiff in the sum of $10,000.

### Opinion.

[1] R. E. Huthsteiner qualified as a mechanical electrical engineer, and had done installation and erection work, switchboard and station design department work; had examined and was familiar in a general way with the station or power plant of defendant in question, with its construction; had done that kind of work, designing stations similar to the one in question in this case.

He was permitted to explain at much length the purpose and function of a substation and matters incident thereto, and the purpose and function of insulation of electric wires. The witness, over appellant's objection, was asked the following questions by appellee, and made the following answers:

"Are the alleyways on the east side of said substation, and being the alleyways on the high tension, high voltage side, sufficiently wide, in your judgment, for an employee to be placed in said substation, and assigned to the duty of sweeping out said substation with a long-handled broom?" To which the witness replied: "Not with the current on the transformers."

Question: "Assuming that the current is on the transformers?" Answer: "No one has any business in there."

Question: "Has any employee any business being in there with the current on, as that substation now exists, assigned to the duty of sweeping that substation with an ordinary long-handled broom?" Answer: "Not in my opinion."

To which questions and answers the appellant made objection "that it is an improper attempt to go into the question of negligence," a question for the jury. Appellant also moved to strike the answer. The exception and motion were overruled, and appellant excepted. The court approved the bill with the explanation that thereafter, by written charge, the testimony complained of was withdrawn; that at the time the first question was asked and answered same was not objected to, but the answer was assailed by a motion to strike. Again, the following questions were asked the witness Huthsteiner by counsel for appellee, and the following answers given:

"Q. You have stated there are certain factors and things that enter into the correct installation of a substation? A. Yes, sir."

"Q. One of those things being clearance and another electrical construction, so as to make it stand up, and safety? A. Yes, sir."

"Q. Have you examined the Grama Street substation in reference to those two items? A. I have."

"Q. Particularly, have you examined the southeast corner with reference to the item of safety? A. Yes."

"Q. Is it safe?"

To the last question appellant objected on the ground that it called for a conclusion, and as having the witness to pass upon the ultimate question in the case, a question for the jury. The court overruled the objection, and the witness answered:

"It is not safe."

"Q. In your opinion? A. In my opinion."

The appellant excepted, and his exception was overruled. In approving the bill the court explained that the above evidence was subsequently withdrawn to the extent shown in the written charge. The first six propositions assign errors to the above questions and answers, substantially to the effect that no employee had any business going into the substation to sweep when the current was on, as being an expression of an opinion upon a mixed question of law and fact; that witness had examined the southeast corner of the substation with reference to the "item of safety," and that it was not safe was the ultimate issue and for the jury; that the withdrawal of the objectionable evidence thereafter did not remove from the minds of the jury the impression adverse to appellant.

It was shown that the current was on at the time, and the deceased came to his death through bringing his arm into contact with a high voltage wire connecting with the substation.

The witness Huthsteiner had made a personal inspection and measurements of the substation at which the deceased was killed, and stated the results of his observations and measurements, and in addition testified as an expert, and is so regarded in the record. In the case of Houston & Texas Central Railroad Co. v. Roberts, 101 Tex. 418, 108 S. W. 808, the Supreme Court of this state, in answering a certified question involving the same rule of evidence as that presented here, held that a witness, though an expert, may not testify to his opinion in a matter involving his conclusion upon a mixed question of law and fact, except upon certain matters indicated in the opinion. Mr. Justice Williams, in writing the opinion in the case, referred to several cases, distinguishing some, but stating the rule as above. We need not do more than refer to the case. After the evidence had been admitted over objection, the trial court, by a written charge, withdrew from the consideration of the jury the objectionable part of the evidence of the witness, but appellant insists that the admission of the objectionable evidence was so prejudicial, and created in the minds of the jury an impression so adverse to appellant that its subsequent withdrawal could not eliminate the impression made. The proposition refers particularly to the statement of the witness Huthsteiner that no employee of appellant had any business in going into the substation to sweep with an ordinary broom when the current was on.

There is no doubt but that the evidence of the witness, after a personal inspection and measurement of the substation, to state in answer to several questions submitted by appellee his conclusions, as above, embracing the ultimate and really only one crucial issue in the case, viz. whether the inclosure of the substation, as the witness stated it to be, was a reasonably safe place for the deceased to sweep, with a long-handled broom, with the current on, was damaging in its tendency, and, if permitted to be considered by the jury, concluded the whole controversy. Where the court, however, has withdrawn the objectionable evidence from the consideration of the jury, to reverse the case on the ground of its improper admission, there must be strong reason to believe that the improper admission of the evidence has caused a wrong to be done to the opposing party which has not been remedied by the attempt to withdraw it. Church v. Waggoner, 78 Tex. 200, 14 S. W. 581.

The members of the court are in agreement in holding that the record does not disclose that the improper admission of the evidence has caused an improper finding of the jury on any of the facts submitted to them. The writer of this opinion submits, in addition to that holding by the majority as his ground for so holding that, where a party on cross-examination of a witness brings out facts not testified to by the witness on direct examination, but similar in kind and effect to the objectionable evidence, he makes the witness his witness as to such evidence additionally elicited; and while he does not waive the right to have the objectionable evidence excluded from the consideration of the jury by reason of such cross-examination, the trial court and this court, in considering the impression remaining with the jury by the admission of the objectionable evidence, and its effect upon the jury's findings, would consider all the evidence, both on direct and cross-examination.

The appellant, on cross-examination of the same witness, elicited answers very similar in kind and effect as those objected to. The record shows that on cross-examination the witness stated:

"I made an examination with respect to the safety of the station. I did not ask to go inside, and I wouldn't go in if I did ask. It is too dangerous. I do know perfectly well people are going in there constantly, and if I were in charge they wouldn't, not with the station alive. If a man goes in there and don't touch the wires, he is safe, but I mean to say this: That to go to the Grama Station station with the current on is an extremely dangerous and hazardous expedition, because the very high voltage wires are so very low to the ground, and so very near together that it is almost impossible, unless you are extremely careful in going in there, you can hardly avoid touching them. * * * I think it requires a very careful man not to come in contact with a live wire in the Grama Street station. There is nothing peculiar about the Grama Street station except that the distances are small. * * * I would not risk my life in there at all."

Appellant elicited from the same witness on cross-examination other statements very similar in effect to that above. To say that the place where the deceased was to perform

his service in sweeping with a broom is "too dangerous" for the witness to go inside, and that it is "extremely dangerous and a hazardous expedition" to do so while the current is on, conveys about the same idea to the minds of the jury as to say, in speaking of the same place and under the same conditions, "it is not safe," in the opinion of the witness. Appellant knew the opinion of the witness on the matters about which he was questioned, from his answers on direct examination, and so knowing, in a long cross-examination, elicited from the witness repetitions of virtually the same statements. If the minds of the jury were prejudiced by the statements of the witness Huthsteiner, as to the condition of the place, with reference to its safety, as insisted by appellant, and their verdict influenced thereby, after the objectionable statement had been withdrawn, the writer could not know whether their minds were influenced in their findings by the questions and answers on direct or cross-examination.

[2] After the trial had proceeded at some length, and the witness Huthsteiner was being examined, he was asked by appellee questions tending to show that the transformers then in the substation should be elevated instead of placed on a concrete platform forming the floor of the structure, thus raising the high voltage wires above the head and in a position not so easily touched, and that it was negligence not to so elevate the transformers. At that time appellee had not assigned as negligence the failure to elevate the transformers. The court sustained objections on the ground that the evidence had no application to any issue of negligence assigned. Counsel for appellee thereupon asked and was granted permission to later file a trial amendment to meet the evidence. Appellant objected on the ground that the trial amendment as suggested would set up a new and distinct cause of action and would require new evidence and new pleading on the part of appellant. The objection was overruled with announcement by the court that he would then hear the evidence and give appellant an opportunity to prepare a motion for continuance. The witness was then permitted to state, in substance, that the weight of the transformers would be the controlling fact as to whether they should be elevated or placed on the ground, and said, "If I were designing a substation to use these transformers, I would elevate them at least a sufficient amount." The objection made to the evidence was that there was then no issue to which the evidence had application.

Our Supreme Court in Telegraph Co. v. Bowen, 84 Tex. 476, 19 S. W. 554, held that article 1824 of the Revised Statutes was not mandatory, and the trial court has a sound discretion in the conduct of the trial. The fact that the trial amendment was permitted to be filed, standing alone, and permitting the evidence as above, does not seem to us to present reversible error. No continuance on account of it was requested.

[3] The allowance of an amendment is largely discretionary with the trial court, and the party attacking the exercise of that discretion must show that it has been abused to his injury. Lipscomb v. Perry, 100 Tex. 122, 96 S. W. 1069. The proposition does not, in our judgment, show reversible error.

[4] Propositions 9, 10, 11, and 12 assign error in refusing to permit appellee to answer certain questions as to her financial condition, after appellee had made statements to the effect that her son's death left her practically destitute; that she had to sell her home to live and pay some bills. The questions and answers are to the effect that appellee's son carried insurance with the government at the time of his death in the sum of $10,000 payable in appellee's favor in sums of $57 each month during the life of appellee, that appellee had been advised by the government that the insurance would be paid in monthly payments as above from the time of the death of her son, and that appellee had received one such payment.

The court sustained appellee's objection to the evidence, and the propositions assign error to the court's ruling. Appellant insists that the evidence should be heard to show that appellee's statement as to her financial condition was not wholly true; that appellee was not destitute; that appellee's statement as to her destitute financial condition was calculated to and did unduly enhance the amount of the verdict.

Appellee's action was for the actual pecuniary damages sustained by her on account of injuries causing the death of her son, Lester, and the measure of such pecuniary damages was the probable amount that he would have contributed to her support had he lived.

[5] The deceased provided, through an insurance policy, in case of his death for certain sums of money to be paid to his mother during her lifetime. The question here presented is: Can such sums be considered, or set off, against the damages sustained by her in this cause of action? If such benefits, under the policy, could not be considered, the evidence tendered was wholly irrelevant and immaterial, and it would follow that it could not be heard for the purpose of showing that what appellee had stated as to her financial condition was not wholly true, an immaterial matter. A witness making a statement about an immaterial matter cannot be contradicted or impeached by showing that his testimony is false. Croft v. Smith (Tex. Civ. App.) 51 S. W. 1089; Railway v. Marshall, 57 Tex. Civ. App. 538, 122 S. W. 946. Appellant refers us to a number of cases to sustain its contention, but the cases referred to, where it was held the evi-

dence should have been heard, were none of them upon immaterial matters. We need not review them. The rule stated is too well settled.

[6] In Tyler S. E. Ry. Co. v. Rasberry et al., 13 Tex. Civ. App. 185, 34 S. W. 794, the Galveston Court of Civil Appeals held that the defendant railway company was not entitled to have the insurance money deducted from the damages occasioned by its negligent act; the action being one under the statute such as the suit here. A writ of error was refused in that case, and we take the holding to be the settled law in this state. The damage sought to be recovered in actions under the Statutory Damage Act is fixed by the statute, and to allow such recovery to be set off by showing that appellee has been provided for by her son through a policy of insurance, would defeat or modify actions under the statute, and would enable the wrongdoer to protect itself against its own wrongful act to the extent of the insurance. The evidence offered was inadmissible to show the receipt of such money, or the existence of the insurance policy. To the same effect are Gulf, C. & S. F. Ry. Co. v. Younger, 90 Tex. 387, 38 S. W. 1121; H. & T. C. R. Co. v. Weaver (Tex. Civ. App.) 41 S. W. 846; H. & T. C. R. Co. v. Lemair, 55 Tex. Civ. App. 237, 119 S. W. 1162.

[7] Propositions 13, 14, and 15 are directed to the sufficiency of the evidence to sustain the jury's finding that the insufficient width of the passageway where the deceased was sweeping when killed was the negligent and proximate cause of his death. The evidence shows that Lester received the shock at the southeast corner wire, near the stationary ladder there. The evidence shows the passageway at that point to be 22 inches, and between a high-tension wire carrying a 13,-000 volt current of electricity, and a stationary ladder. At the time of his death, Lester had swept right up to the ladder. There was a blowout (puncture) on the east side of the wire at that point. The ladder was a little south of the wire.

Witness Winder, testifying as an expert witness, for appellant, said: -

"I have said that one of the chief things around one of these big voltage wires is to have a sufficient space. I do not care to change that statement. I mean space to employes and everybody else. * * * That substation out there could have been made with greater clearance and bigger alleyways and not have that ladder in the southeast corner, and have functioned electrically just the same. * * * That substation could have been constructed with broad clearances and functioned electrically just as well. There is no electrical reason for the 22-inch clearance between the wire and the ladder. * * * The average man would have about 17-inch shoulders. Standing to grasp a groom to sweep, his elbows would naturally extend beyond his shoulders, so instead of being 17 inches it would be in the neighborhood of 24 inches. And as he sweeps his arms swing back and forth. The distance from this point in this position, to the corresponding position over here would probably be about 36 inches, so a man in sweeping and doing his duty, looking at the floor, ought to have a swing of 36 inches, if he swept that way. * * * The Grama Street substation could have been made safer in one respect by not having that ladder in the southeast corner and affording a greater clearance there, but the danger zone about the conductors would have been just the same; I mean that six-inch danger zone. That substation could have been made safer from contact with the conductors by having the inclosure, the little paling fence out further, and the telephone posts out further and by affording greater clearance, but you could operate with less caution. I do not want to leave the impression that it is safer with more distance. The safety is all in the first few inches around the conductor, the distance from that might be infinite and still not safer, you can operate with less caution. * * * I notice that the clearance space would have been more in the southeast corner, near the wire where Lester was killed, if the ladder had not been there. Roughly speaking it probably would have been double."

The witness Huthsteiner testified:

"From the ladder to the puncture and near that southeast corner wire is 22 inches (the witness Anderson said 23 inches). There is no way to go in and about and around that substation, save and except by passing through that passageway there if one is going to make the loop around. In my opinion that is not a sufficient distance from a high voltage wire of that sort, and nothing like a sufficient clearance. The ladder is stationary, and for all practical purposes that wire is stationary. * * * I would say there should be at least two or three times that much clearance as a minimum. If I were designing a station for a 13,000 volt current, I would give a man five or six feet clearance to walk in. * * * If the ladder was not placed in the southeast corner of the Grama Street station the clearance would have been a little more than double, but in my opinion that would not have been enough for 13,000 volts."

On cross-examination appellant examined the witness Huthsteiner very extensively on all matters pertaining to the station. On the issue as to the proper width of clearance the witness stated on cross-examination:

"In a substation of 100 k. v. a. capacity, a 13,000-volt substation, in my opinion none of the passageways where a man is intended or supposed to walk should be less than five feet, preferably a little more than that. It is usual and customary never to make them less than five feet. These considerations as to clearance and passageways should enter into it, irrespective of the likelihood or probability of future expansions."

Dr. Miller, speaking of the burn on the body of the deceased, said:

"It was a burn as contact for a short period of time with a high voltage electric current would render."

There were other statements from witnesses similar in tendency to the above. The evidence was sufficient, we think, to justify the submission of the issue 'as to the sufficiency of the passageway.

[8] The sixteenth and seventeenth propositions question the sufficiency of the evidence to sustain the jury's finding on the issue of contributory negligence; the contention being that, the danger not being a hidden one, and fully known and understood by the deceased, no other conclusion could be drawn from the evidence but that deceased was negligent in bringing his arm in contact with the high voltage wire.

Appellant alleged that Lester was negligent in permitting his arm to come in contact with the high voltage wire. The court submitted the issue of such negligence, and the jury found the issue against appellant. The undisputed evidence shows that Lester received the shock that caused his death at the southeast corner wire near the stationary wire there, and while using an ordinary broom in sweeping out the station at that point. While it was shown that it was not absolutely necessary for him to touch the wires in sweeping at that point, and that he could do so without touching the wires, that he knew of the danger in touching the wire, it was also shown that at the point where he touched the wire the clearance between the ladder and the wire did not exceed 23 inches, that the clearance should not have been less than 36 inches, and the jury found that appellant was negligent in not having a greater clearance at that point. We understand the question presented of contributory negligence to be controlled by article 6645, Vernon's Sayles' Texas Civil Statutes, as amended by chapter 100, General Laws 37th Leg. p. 195 (Vernon's Ann. Civ. St. Supp. 1922, art. 6645), providing that while the employee assumed the ordinary risks incident to his employment he does not assume risks resulting from negligence of his employer, though known to the employee, and that whatever negligence might be attributable to the employee in remaining in the employ of the company must grow out of the ordinary risk of dangers of which he knew. We do not understand the risk from the danger of coming in contact with the wire at the point where he did come in contact with it, and, under the circumstances disclosed by the evidence, discloses such contributory negligence on the part of the deceased as to invoke the rule of comparative negligence provided by the above amendment. But if we are mistaken in the above, the question for the jury to determine, we think, would be, What would an ordinarily prudent man have done under the circumstances? If an ordinarily prudent man under the circumstances would have undertaken to sweep the station at that point, the deceased would not be guilty of negligence. It

was purely a question for the jury to say what a prudent man, under all the circumstances, would have done. Railway v. Mathis, 101 Tex. 342, 107 S. W. at page 535.

[9] As we construe article 6645 as amended, as above, the court was not in error in refusing to submit the requested charge on assumed risk.

[10] Appellee was 54 years of age and of good health at the time of her son's death. Deceased was 24 years old and was earning on an average of $125 per month. The verdict and judgment of $10,000 was not excessive.

Affirmed.